Mr. Wall. Mr. Wall. Thank you, Mr. Chief Justice, and may it please the Court. The only damages theory in this monopolization action is rooted in a 30 percent commission that Apple charges app developers, and which allegedly causes those developers to increase app prices to consumers. The case is barred by the Court's Illinois BRIC doctrine because the developers pricing decisions are necessarily in the causal chain that links the commission to any consumer damages. If the commission increases beyond the competitive level, but apps developers do not change their apps' prices, consumers suffer no damages. And if app developers do change their prices to pass on some or all of the overcharge, well, that is precisely the kind of damages theory that the Illinois BRIC doctrine prohibits. Ginsburg Is there any, in your view, is there any first buyer in this picture? Mr. Wall. Excuse me? Ginsburg Is there any first buyer in this picture? Mr. Wall. Well, there's two different buyers in this picture. There are the app developers who, by contract with Apple, are buying a package of services which include distribution and software, intellectual property and testing and so forth. And then the plaintiffs in this case are the buyer of the apps themselves that are made with that package of goods and services. Ginsburg My question was, within Illinois BRIC, is there in this case anyone who would qualify as a first buyer, withstanding to sue Apple? Mr. Wall. The developers, yes, without a doubt. The developers are the ones who, in the first instance, pay the 30 percent commission. I think it is important to root the analysis in the common ground which has been conceded, that the only damages theory is based upon that 30 percent commission. That is charged by contract between Apple and the developers, and it is deducted from whatever price that the developer chooses to set, subject to only the minimal restriction. Sotomayor I'm sorry. The first sale is from Apple to the customer. It's the customer who pays the 30 percent. But there has always been a transaction between Apple and the developer before that which has the pricing decision of what the developer is going to do on account of the 30 percent commission. There is never ---- Sotomayor Could I ask you something more generally about Illinois' BRIC? That was a case of a vertical monopoly. A concrete block person, manufacturer, monopolizes the next intermediate market who then sells to a customer.  Yes. Sotomayor All right. This is not quite like that. This is dramatically different. This is a closed loop. Breyer It is a closed loop, but in terms of the injury theory, which is what is at issue in ---- Sotomayor They are not claiming the 30 percent is their injury. Breyer No, they are ---- Sotomayor They are claiming their injury is the suppression of a cheaper price. It doesn't have to be 30 percent. They are not seeking 30 percent of their sales. They have to go out and prove at the next step how without this monopoly they would have paid less. It could be as little as a penny or nothing, or it could be something more. But the point is that this closed loop with Apple as it spoke, they are the first purchaser of that 30 percent markup. Breyer No, they are not. The first purchaser is clearly the app developer, who by contract agrees that every time it puts a positive price on an app, it will allow Apple to take 30 percent of it. And the damage is theory. Sotomayor Apple took 30 percent from the customer, not from the developer. Breyer Apple collects the funds, but even the Ninth Circuit here agreed that the process, the payment flow, is immaterial to the Illinois brick issue. Breyer Certainly, I wouldn't think that's true, even if they concluded it. It is a simple theory. I would have thought it would have been an antitrust for at least 100 years. What you do is you look to see who you claim is the monopolist. Who do they claim is the monopolist? Sotomayor Apple. Breyer Apple. And if you pay more, if that's true, they can raise prices to some people, lower them to others, their suppliers. And if you are injured because you paid them more, the monopolist, you can collect damages. And if you're injured because they forced your price down, you're a supplier, you can collect damages. End of theory. I don't see anything in Illinois brick that conflicts with that. Everything in Illinois brick conflicts with that. The emphasis in all three of this Court's decision on both pass-on defenses and damages theories, that's what the doctrine disallows. It says that they're Breyer It says, if I don't mean to interrupt you, but I don't want you to miss the point I'm making, if Joe Smith buys from Bill, who bought from the monopolist, then we have something indirect. But if Joe Smith bought from the monopolist, it is direct. That's a simple theory. Now, I can't find in reason or in case law or in anything I've ever learned in antitrust anything that would conflict with that. And what I want you is to tell me what. What conflicts with that in this case is that the alleged monopolization, which is over the distribution function, allegedly first manifests in a 30 percent commission. Consumers do not pay the 30 percent commission. There was an effort in the district court to try to argue that Apple added that, but that was abandoned. So what we have here instead is a damage theory that runs through the independent pricing decisions of the app developers. Kagan Does your answer to Justice Breyer depend on what you said, that the alleged monopolization is in the distribution function? Because I understood the Respondents now to be saying, no, that's wrong. The alleged monopolization is in the apps themselves. In other words, the consumer says you have a monopoly on apps. You might also have a monopoly on the distribution function, which the app developers have to live with. But you have a monopoly on apps, which the consumers have to live with. So in responding to Justice Breyer, you said, well, it's because the alleged monopoly is the distribution function, but I don't think that that's correct. Well, two points, Justice Kagan. First of all, it is correct. The complaint repeatedly alleges at paragraphs 3, 8, and 53 that this is a case about a distribution market. It has always been a case about a distribution market, and it necessarily is, because there is no good-faith allegation that Apple actually monopolizes the apps as software. It is simply the pipeline, the sale of the apps, which is alternately described in this case as either distribution or as the so-called aftermarket, which is simply limiting that to iOS apps instead of the 80 percent of the apps. Breyer. There are an awful lot of words in this case that I tend to have trouble understanding. One is two-sided market. Another is a lot that you used. So I go by simple analogy. If Bill buys from the monopolist, he is a direct purchaser. If Bill buys from Sam, who buys from the monopolist, he is an indirect purchaser. Anyone can understand that. And when I get into what I think of as jargon, I begin to think, suppose I were you advising United Fruit Company. I have a great idea. You won't have to torpedo the boats of your competitors anymore. Here is what you do. What you do is you buy from the farmers, and you tell the farmers what you will pay the banana farmers is a very low price plus 30 percent commission. And then what you do is when you sell to banana consumers throughout the world, you charge them that 30 percent commission, which they say is a higher price. And if you, United Fruit, did not become a monopolist, now I think I'm advising Jay Rockefeller, John Rockefeller, and I give him the same advice. And I give the same advice to United Chew, which happened to be a distribution company, and we thereby have, well, you see the point. But the difference here is that there is no third party intermediary that is setting the price and exercising its independent determination as to whether any or all of the initial overcharge, which is some part or all of the commission, is going to manifest itself in the app's price. And that's why I started with the simple, I would say, you know, the hypothetical of imagine the price today is the competitive price, the 30 percent is the competitive price, and it goes up by 10 points tomorrow. No consumer is injured unless the app's prices change. The app's prices have to change. And if they don't, and they only change by virtue of a decision which implicates everything this Court talked about in Hanover Chew, in Illinois Brick, and in Newport. Kagan. Kagan.              Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Now, the question was not was it about a vertical supply chain or instead was it about a pass-through theory. Now in the facts of Illinois brick, and indeed in the facts of all the Illinois brick cases that we've discussed, you had both. So you didn't have to separate the two. And now here you don't have both because this is not a vertical supply chain, but there still is a pass-through mechanism. So then the question is, does Illinois brick apply to that or not? And I think what Justice Breyer was suggesting to you, that as long as it's not that vertical supply chain where the person is not buying from the monopolist itself, here the person is transacting with the monopolist itself, that that's what separates this case from Illinois brick and makes it entirely different, notwithstanding that there's some kind of pass-through mechanism involved. I completely agree with you that the key to this is deciding what Illinois brick was about. Was it simply a formalistic case about vertical chains or was it about pass-through? And in answering that question, I would begin with, first of all, with Hanover Shoe, which is about a pass-on defense and about the difficulties and the potential complication of antitrust litigation through pass-on defense. And then the framing of the question in Illinois brick by this Court, which said, having already found that we will not allow a pass-on defense, we are now confronted with the question to whether allow pass-on to be used offensively. It was 100 percent about pass-on. The vertical chain was the factual setting of the case, and indeed Respondent's Court believed that the factual setting is the sum and substance of the Court's reasoning. Mr. Wall, could I ask you about what troubles me about your position? And it is this. Illinois brick was not about economic theory. It was about the Court's or the Court's the basis for the decision was not economic theory. As I read the case, it's the Court's calculation of what makes for an effective and efficient litigation scheme. And maybe your answer to this question is that the validity of Illinois brick is not before us, but I really wonder whether, in light of what has happened since then, the Court's evaluation stands up. And take the third point that it makes about that the direct — the so-called direct purchasers are the most efficient and most — in the best position to sue. If we look at this case, how many app developers are there whose apps are sold at the Apple store? Tens of thousands. Yeah. Has any one of them ever sued? None have ever sued. There have been plenty of disputes, but none has ever gone to litigation. For that matter, no State or Federal antitrust agency has ever sued either. We do not take that — we do not take the absence of litigation as evidence of an oppressed developer community that cannot speak for itself. These — you know, the fact of the matter is that nowadays, major companies suing their suppliers happens all of the time. The idea that it doesn't, which was decried by Judge Posner as fanciful, has proven to be fanciful because it literally happens all of the time. Well, Mr. Wall, along those lines, I take your point that Illinois brick and Hanover shoe might be read about the economic realities of the pass-through mechanism being important rather than the contractual formalities, whether it's a sales agent or a formal purchase between the manufacturer and the distributor. And antitrust normally accounts for economics rather than forms of contracting. I take your point. But building on what Justice Alito had in mind, Illinois brick has been questioned by 31 states before this Court in an amicus brief. You're asking us to extend Illinois brick, admittedly, only because of a contractual formality and the economic realities are the same. I'll spot you all of that for purposes of this question. But why should we build on Illinois brick? Shouldn't we question Illinois brick, perhaps, given the fact that so many states have done so? They've repealed it. There haven't been a huge number of reported problems with indirect purchasers and direct purchasers receiving double recovery, one of the problems Illinois brick built on. And the other one, which Justice Alito alluded to, is direct purchasers don't always sue because there's a threat that monopolists will share the rents with the direct purchasers. And indirect purchasers may be better suited to enforce the antitrust laws. So long wind up. Sorry. But there's the pitch. Sure. So a few things. First of all, it is an enormously complicated and controversial issue what to do with the Illinois brick doctrine. You can see this in the briefing in this case, where, yes, you did have States saying repeal it. You also had the plaintiffs bar through the American Antitrust Institute say don't repeal it. There have been, I think, on the order of 17 efforts in Congress to have it changed. Not once has it ever gotten to the floor. It is a quintessentially controversial political issue which belongs across the street, not here. I would disagree completely. Why is that so, if the Court created the doctrine in the first place? Because I don't think it's fair to say that the Court just created it. What the Court did was applied the foundational principle of all section 4 jurisprudence, which is the proximate cause principle of damage is not going past the first step. And then it dealt with that in the context of the potential for duplicative pass-through overcharge claims, which are a unique problem in antitrust. It's not a general problem of all damage theories. But when you have overcharge cases, and this gets to Justice Gorsuch's point about the potential for duplicative recovery, it's not hypothetical. It's automatic. It's mathematical. If the first purchaser gets 100 percent of the overcharge because of hand over shoe, anything else that is recovered that gets added on that is necessarily duplicative, and that's what happens in the district courts. You get the direct purchasers and the direct purchasers suing on whatever theory optimizes their levels of recovery. I'd like to reserve the rest of my time and turn it over to the Solicitor General at this point. Roberts. Thank you, counsel. General Francisco. Mr. Chief Justice, and may it please the Court, I'd like to begin where Mr. Wall left out, and I think it addresses many of the questions that have been asked here. At bottom, Illinois brick and hand over shoe properly understood prohibit pass-through theories, and they reflect a basic application of the background principles of proximate cause that this Court generally reads into statutes of this sort, and in particular, the rule that damages stop at the first step. Here, the first step is the app maker's pricing decision, because the respondents, the consumers, are injured if and only if the app makers decide to increase their prices in order to recoup Apple's. General, I have to say, I find that a not intuitive argument, because it just seems to me that when you're looking at the relationship between the consumer and Apple, that there is only one step. I mean, I pick up my iPhone, I go to Apple's app store, I pay Apple directly with the credit card information that I've supplied to Apple. From my perspective, I've just engaged in a one-step transaction with Apple. And when I come in and say, Apple is a monopolist, and Apple is charging a super competitive price by extracting a commission that it could only extract because of its market power, I mean, there's my one step. Right. I understand that, Your Honor. But in proximate cause, the issue is not transactional proximity. The issue is proximity between the illegal conduct, on the one hand, here, Apple's monopolistic overcharge, and the injury to consumers, on the other hand, here, the higher prices. And Apple's monopolistic overcharge is not the direct cause of higher prices. The direct cause of the higher prices is the app maker's decision to increase their prices in order to recoup the overcharge. But how do we know that? How do we know that, given that Apple really operates as a retailer in many respects here, as Justice Kagan points out? And how do we know that the 30% charge is not affecting the price? Well, you don't know. In the same way that any retailer that adds 30% would affect the ultimate price paid by the consumer. You don't know for sure, but that's the whole point. Here, because app makers set the final price, they have a choice to make. They either absorb the overcharge and keep prices the same, in which case the consumers aren't harmed at all, or they increase their prices to recoup the overcharge, in which case the app makers are also harmed because they face a drop in sales as a result of increased prices. But the consumers are harmed then, too. Yes, Your Honor. And that's the whole point of Illinois BRIC and Hanover SHU. When you've got part of the harm going to that initial party that's bearing the full brunt of the overcharge in the first instance because of its pricing decision, that's the party that gets the whole claim. But we have ambiguity about what Illinois BRIC means here, and shouldn't that ambiguity, if there is such ambiguity, be resolved by looking at the text of the statute? Any person injured? Yes, Your Honor, and what I think that Illinois BRIC reflects is the type of statutory interpretation that this Court has engaged in in a variety of cases, including the RICO cases, including the Lexmark cases, where you interpret background principles of proximate cause to be built into the statute, including the rule that damages stop at the first step. Does it make a difference, General, that Apple is influencing the prices here? In other words, this is you're suggesting that the app developers are just sort of setting these prices independently. But I'll give you sort of two ways in which that's not true. The first way is this 99-cent charge, which you might say, well, that doesn't matter because, you know, it could be 99 cents or it could be $100.99. But in fact, these are all low-cost products for the most part. So saying a price has to end with the, you know, the number 99 is saying a lot about the fact that you can't charge 77 cents or 55 cents or 32 cents. So that's one. And the other is the entire allegation here is that Apple is truly a monopolist on both sides of the market. It's able to dictate to developers whatever price structure it wants. And it's also able to dictate to consumers what the nature of the sale is going to be. And in that event, it sure seems as though, you know, Apple, you know, happened to set up this commission that puts it in the ambit of Illinois BRIC. But it could have done a thousand other things that are essentially the same that would have taken it out of the Illinois BRIC rule. Sure. And let me take those points in turn. First, the 99-cent pricing policy. The first thing I'll point out is it's not in the complaint. But we'll put that to the side and assume that it's part of this case. Here, I don't think it changes the fact that the app makers still control the overall price and to the extent that respondents are harmed by that, it's based on a pass-through. Look, if I go to an auction house and I have to bid in $10 increments, nobody thinks the auction house is setting the price.  And here, the respondents are going to be the bidders. So if you bid in $10 increments and the true alternative prices are $3, $5, and $7, then indeed you are setting the price. Well, that's my second point, Your Honor. Here, any injury is based on a pass-through because app makers are either going to round up or they're going to round down. If they round down to the lower 99-cent price point, the consumers aren't injured at all. If they round up to the next 99-cent price point, the consumers are injured as a result of a pass-through theory. And it's that intermediating pricing decision that we think that under the principles of proximate cause that the problem is that they're not measuring damages by that. As I understand, they're saying it's not the 30 percent. It is what the price would be if we could buy apps outside of this closed loop. And it could be theoretically a lot higher than the markup. It could well be within it. But the point is that that 30 percent or whatever that 30 percent figure is, is not the measure of our damages. That's as I understand that they're saying the developers may have their own claim. Their damages likely have to stay within the 30 percent. But we don't measure our damages by that. So respectfully, I'll disagree with that. And in explaining it, Justice Kagan, I think I can also answer the second part of your question. The harm to the consumers here is that they have to pay higher prices for apps. And the reason they have to pay higher prices for apps, and, Justice Kagan, this goes to your question, is because Apple controls the pipeline that connects app makers on the one hand and iPhone users on the other. And the way they exploit that pipeline through their alleged monopoly is by charging that 30 percent commission. So the only reason consumers are harmed here in the form of paying higher prices is because the app makers decide to increase their prices in order to recoup that commission. And, Justice Breyer, to your question, the reason why this makes it different than your hypothetical of Bill buys from Sam and you have transactional proximity is because the question isn't proximity between the parties who are transacting with one another, but proximity between the antitrust violation, the 30 percent commission, and the harm to consumers in the form of higher prices. I wouldn't have thought that was the antitrust violation. I would have thought the antitrust violation is having enormous market power achieved by not patents and not for skill, foresight and industry, but rather anti-competitive or more restrictive than necessary practices. Alcoa. For sure. Alcoa did not charge higher than competitive prices. And that's why Learned Hand said the easy life, not necessarily higher prices, is the reward often of monopoly. Now, I would have thought it's a matter for proof at the damages stage whether, in fact, Apple, assuming they prove it is a monopoly, has extracted higher than competitive prices from those particular people, the plaintiffs, or whether they've just had the easy life. Right. Now, I don't think that's the stage we're at in this case. So if you say right, right, right, they must win. No. So what I wanted to say is that, for sure, the Illinois brick theory doesn't apply across the board, but it does apply when somebody is bringing an overcharge theory, as in Illinois brick, as in Hanover shoe, and has here. Don't we have we had trial on that? Your Honor, where you have that kind of overcharge theory, what Illinois brick says, asks, is under basic principles of proximate cause, is there some party other than the monopolist that's standing in between the plaintiff's injury in the form of higher prices and the monopolist's violation in the form of the commission? And whenever the price setter, the ultimate price setter, is somebody other than the monopolist, it's never the monopolist's overcharge that is the direct cause of the injury. But if the app developer, if Apple bought the apps from the app developer and then added 30 percent to it and sold it to the consumer, you would agree that a claim could lie there, correct? Your Honor, I want to make sure I understand the hypothetical. If Apple's buying the app from the app developer for a price, Apple's then adding 30 percent to that price and selling it to the consumer. The consumer alleges that Apple's doing that as a result of monopolistic behavior. Claim lie? Yes, you can sue Apple directly, but you can't sue Apple if the if Apple isn't the price setting party, but the app maker is the price setting party. And that's why, and I finished the answer, Your Honor, and that's why the key is who sets the price, and it's very hard to manipulate our rule. Because under our rule, you actually have to change the party that has the authority to set the final price. And that's a fundamental change in the nature of the transaction itself. Thank you, counsel. Mr. Frederick. Frederick, thank you, Mr. Chief Justice, and may it please the Court. Apple directed anti-competitive restraints at iPhone owners to prevent them from buying apps anywhere other than Apple's Monopoly app store. As a result, iPhone owners paid Apple more for apps than they would have paid in a competitive retail market. Under this Court's precedence, iPhone owners have a cause of action under section 4 of the Clayton Act directly against Apple for those overcharges. The court of appeals should be affirmed for three reasons. First, Illinois BRIC is a bright-line rule that Respondents easily satisfy. Second, Apple directed its Monopoly abuses at Respondents. So it's appropriate that Respondents can sue Apple for their damages as a result of those violations. And third, Apple seeks to expand and modify the bright-line rule of Illinois BRIC to deny indisputably direct purchasers an antitrust remedy and to change the rule into a standardless inquiry that will be hard to apply at the pleading stage. Now, if I could return to the first point, the direct purchaser rule is a bright-line rule. This Court said so in Illinois BRIC, and importantly, a case that has not yet been discussed today in Utilicorp, in which the Court said Illinois BRIC is a bright-line rule for direct purchasers, notwithstanding the economics that go into that. Utilicorp was a case that protected the defendants who were asserting that the – who were asserting that the – there was a break in the link of the chain. This case is really the flip side of that to protect plaintiffs who directly purchase from the alleged antitrust violator and are claiming damages as a result of that antitrust violation. Roberts. There's one antitrust violation under your theory, which is the increase, the 30 percent increase that Apple imposes when it's – when, as you put it, it sells the apps. Wrong. And this is very important for the Court to understand. The antitrust violation here is the Monopoly app store. Consumers cannot buy an app anywhere other than Apple's 100 percent owned Monopoly app store. But when it comes to the 30 percent increase, you're obviously saying the purchasers, again, under your theory of the apps, are harmed by that and can recover damages for that, and also that the developers are harmed by that and they can recover damages for it as well. In other words, to the extent, as might be said, that Apple is in a two-sided market, they're subject to suit on both sides of the market for a single antitrust price increase that they're alleged to have imposed. So, Mr. Chief Justice, I think that your question kind of gets to the core of a lot of the confusion here, because by having a wholly owned Monopoly app store, Apple is able to distort the market at the supply chain and at the retail chain for consumers. We, representing consumer iPhone owners, are suing only for the damages that we incur. That is the higher than what a competitive market price would be for apps. Our measure of damages is not necessarily the 30 percent. The 30 percent is simply proof that Apple is acting as a monopolist because it extracts I understand your claim on your side of the market, but you do think that the developers have a claim as well, don't you? Well, I have no belief. It's not the same. It is a different claim. For the same price increase, the same? No. I disagree with that, Mr. Chief Justice. Apple's supplier of the apps, if they have a claim, it is that Apple has distorted the market for the supply of apps in a way that hurts app developers' profits. Their argument would be, if we weren't suffering under the one Monopoly store constraint, we might be able to charge a different price, lower than 99 cents, and be able to get a direct purchase from an iPhone. Well, I think you're just saying that the measure of damages would be different between the two sides of the market. And they would be different damages. In other words, you're saying the consumer says, I'm paying a higher price for the product. It might be the entire 30 percent commission. It might be some portion of the 30 percent commission that's super competitive, but I'm paying a higher price for the product. And the app developer says, well, I don't you know, that's irrelevant to me. I don't have to buy the product. What's relevant to me is fewer people are buying my apps. And that represents some amount of lost profits. But those two things are not good. I mean, it is true that two people are being able to sue because Apple is transaction with each of these people, and each of them has a gripe against what the way Apple has structured the market. But the damages are entirely different. One is a measure of lost profits, which may or may not exist. The other is I'm paying too much. That's correct. And if it's not true, it's not true. But that's an interesting theory, but is that the theory, is that your claim? Yes. I thought this case was all about the 30 percent. Well, the other side has been trying, Justice Alito, to make the case all about the 30 percent. But if you read the case. So the 30 percent has nothing to do with this? What the 30 percent is, is an allegation that Apple is monopolizing the sale of apps. And we know that because they can extract 30 percent on every single sale, which only a monopolist could do. The 30 percent is not a measure of damages. I'm not aware of any case from this Court that says you have to plead antitrust damages with particularity. But the – because of the ability to extract a monopoly rent, we can say in good faith that they – we are paying more than we would pay than if a competitive market existed. Mr. Frederick, I think you'd agree that there can only be one monopoly rent. And then the question becomes who's paying it. And it might be spread partially between direct purchasers and indirect purchasers. It might be partially spread between the app makers and the purchasers of apps. And disaggregating that is the question that we've been wrestling with here. I guess here's where I'm stuck and need your help. You say that Illinois BRIC is a bright-line rule premised on the existence of a contractual relationship between the buyer – the ultimate purchaser and the intermediate seller, and that there has to be that kind of relationship. Rather than a sales agency relationship like we have here. But antitrust doesn't usually depend upon such contractual formalities. It usually depends upon the underlying economics. And I have a hard time distinguishing this case from Illinois BRIC in the sense of the – in the question of economic pass-through and the problems that it presents, the possibility that the intermediate purchaser may absorb the monopoly rent and not pass it along. Now, that raises for me the question – further question. I'll wind it up quickly, I promise. Whether Illinois BRIC is correct, right? And you have an amicus that says it's not. But you don't make that argument. I'm really curious why. The plaintiff's bar is not making that argument before this Court. So there's a whole bunch of things for you to chew on. Okay. I'll try to chew on them succinctly, Your Honor. We haven't asked for Illinois BRIC to be overruled because we plainly meet the bright-line rule. We paid Apple, and Apple was – Say I don't buy the formalistic contractual – it seems to me an argument in the law of contracts rather than the law of any trust. So help me out with economics. Economics. We paid money. Apple never shared that money with any middleman. Illinois BRIC is a case about a middleman. There's no middleman here. We paid the money. Apple kept 30 percent of it before sending 70 percent off. Again, that's based on the form of the relationship. Talk to me about the possibility, the problem that the app producer might absorb the monopoly rent. That's the economic problem that I'm stuck with. Okay. If I could try to answer your question with a hypothetical, and if the Court would indulge me, suppose at a competitive market the price for an app was 90 cents, not 99 cents as Apple is charging. It's 90 cents. We would all agree, I think, that the consumer can sue for the 9-cent differential between the monopoly price – I understand the 99-cent argument. Okay. Let's put that aside. All right. Now that we've got that aside, let's look at it from the developer's perspective. If they had a claim, if they had a claim, and I'm not saying that they do, but if they had a claim, they would need to show the difference between the profits that they would have achieved in the monopoly app store versus the profits they would have achieved at a competitive market price. That depends on three factors. Okay. One is the difference in sales that they would achieve between 99 cents and 90 cents. The second is how their sales differences would affect their revenue. And the third is whether the commission was 30 percent in a competitive market. Okay. So if you take my hypothetical, the damages for the developer, there are three possibilities. One is that it's zero. If the commission went to 22 percent in a competitive market, the developer takes home 70 cents just as it does with Apple's 30 percent in a 99-cent monopoly market. At a 22 percent commission, the developer has zero damages. The developer would have positive damages if the commission were zero, because then the app developer sustains damages of 20 cents. The developer would make the 90 cents in the competitive market instead of the 70 cents that Apple is now passing along by virtue of the monopoly market. The damages would be negative, though, if in a competitive market the commission stayed at 30 percent, because there the benefits that would achieve by the monopoly market would be the price of 99 cents give the developer an extra 8 cents per transaction. So in that way, Mr. Chief Justice, the developer has a different claim. It's based on its lost profits, and that would be irrespective of whether the buyer of the app, the consumer, sustains damage for the 9 cents in my hypothetical. You can run these out under different you can get your law clerks to run all the different scenarios. It always works the same way. Unless we're prepared to overrule, which wasn't our case, Alcoa, I think all you'd have to show is, one, they have monopoly power, and two, they achieved it through less restrictive, for more restrictive than necessary practices. End of your burden. In your case, and Justice Gorsuch is quite right, there's only one monopoly profit to be earned. And so you'd have a different question when you get to the damages stage. The different question is, well, how did they divide that monopoly profit? You'd like to show that they got some of it from consumers, but that's for a later proceeding. That's correct. And you're adding one thing. One of the things that we want to use in order to prove that they do have monopoly power, i.e., the power to raise price significantly above a competitive level, is they charge us so-a-bloody-buddy much money. That's just a piece of evidence here, and we'll worry later. Agreeing that there's only one monopoly profit, in theory, as to who got what. Now, have I stated that correctly? Yes, you have, Justice Breyer. I mean, the basic problem in this case as it comes to this Court is who gets to complain about the Monopoly App Store? We say as the buyers of the apps from the Monopoly App Store, there's no form or function, there are no contract issues, Justice Gorsuch, that create a different form versus function problem. We're paying the money. They're keeping it. And we think we're paying more than we would have to if the market was competitive. They say it would be different if Apple purchased the apps from the app developer and then added 30 percent on the sale. And why is that not different? Because it's irrelevant, and here's where we part company from the Solicitor General. It's irrelevant who sets the price, so long as what the violation is here, the Monopoly App Store leads to higher prices that the consumers have to pay. That's what the violation is. That's how we are approximately harmed. So in the very hypothetical, Justice Kavanaugh, that you posed to the Solicitor General, the Solicitor General concedes we are direct purchasers in a situation where the app developer sets the price and they simply tack on 30 percent by virtue of their Monopoly power. It's no different here. If you think about it in terms of what is actually going on, suppose Apple dropped its commission from 30 percent to 20 percent, but it maintained the price restriction of a 99-cent app. From the consumer's perspective, we're still overpaying for the app. Under that hypothetical, Apple simply gives the app developer more money, but that doesn't affect the consumer welfare at all. Now the General said that if in fact Apple bought these products from suppliers and paid them and then added 30 percent to you, that that would be a classic antitrust violation. You're saying that's basically what they're doing here anyway. But let's take the reverse. Let's say they collected money from you and paid all of it over to the developer and then told the developer, give us 30 percent of that back. Would you then still be a direct purchaser? And so we would still be direct purchasers if under your hypothetical we're buying it from Apple and then Apple is engaging in the Justice Gorsuch form over function situations in terms of how the money gets moved around. I think that the – in that situation, we are still directly purchasing and we're still able to complain about Apple's violation. And I think under your hypothetical, Justice Sotomayor, we have to keep the idea that Apple is still operating a monopoly app store. It's no different than if there was a grocery store chain that monopolized the sale of all vegetables. If they – if that is the only place you could buy vegetables, we would say that that monopoly store outlet was able to control prices and affect output. That's basically what's happening here. Well, I think Justice Sotomayor's question is – requires further exploration. I mean, are we in danger of just incentivizing a restructuring of contracts here so that all that Apple does or people like it is make you purchase directly from the app provider and then it then returns the profit to Apple later? And if that's all we're doing, then what is the point of Illinois BRIC? And you still haven't explained to me why the plaintiff's bar isn't asking to overturn Illinois BRIC when 31 states are. So help me on both those. They're two separate questions. Okay. So let me take the second one first, Justice Gorsuch. I don't represent the plaintiff's bar. I represent the consumers in this case, and the consumers in this case have no brief and no beef with Illinois BRIC. We think we are direct purchasers. We satisfy the rule. We come within the bright line. That's okay with us. What the Court decides doctrinally to do with Illinois BRIC is obviously something where I think you go to a different situation if the case arises. But on your other point, I think it's the other side that is actually asking for the opportunity to use contracts in order to distort or recharacterize matters in a way that evades the Illinois BRIC bright line rule. Well, assume for the moment that I believe the economics underlying the two arrangements are very similar, hard to distinguish. I haven't yet heard you give me a good argument why. So let's just posit that. Then it really is just about form, isn't it? No. I think in that hypothetical, I would be prepared to say if we were paying the developer directly for the app, and the app developer could set whatever price it wanted to set, okay, keep with me on that assumption, the app developer operating in a free market can set whatever it wants to set, and then Apple comes after the app developer and says, hey, you bought it, the consumer bought it through our store, we want whatever we want, that becomes not a problem with the consumer, that becomes a problem between the developer and the app. So pricing control is really important to proximate cause, then? I beg your pardon? So pricing control is really important to proximate cause? No. Pricing control is not important to proximate cause in the sense that whether ‑‑ I think under direct proximate cause, we're buying the app directly from the app developer, and remember a key part of my answer was the app developer can set that price competitively in a competitive market. What arrangements happen between Apple exercising its monopoly control through the app store and the supplier is not something we are proximately affected by that. Sorry to interrupt. Your point was that the other side is putting form over the reality. That's correct. And they're doing it in a way that is particularly standardless, because what the court in Utilicorp held was that even when it is absolutely clear 100 percent of the overcharge is going from the natural gas supplier through the utility directly to the consumer, this court held, no, we're going to keep the bright line rule, only the utility gets to complain about the natural gas overcharge. And it was that bright line rule that the court said is going to apply, and the reason is exactly, Justice Alito, for the point that you made, which is that it's about judicial administration at the pleading stage. We're just trying to figure out who has the claim and who can complain about the antitrust violation. Here, that's clearly the consumers, because we're the ones who are paying Apple the money to receive the app. And so to Justice Kavanaugh, to finish off the point, what the other side is essentially asking is that instead of having a bright line rule, it's a very fuzzy rule, because they don't have a test for what constitutes a pass-through. They don't have a test that applies when there is no middleman. There's no middleman in this particular transaction. It's directly between the iPhone owner and Apple. And so you're going to have to figure out. Do they get a one-ticket good for this case only? They happen to be the largest company in the world, or at least they were some weeks ago, and they are able to extract monopoly pricing by virtue of a unique e-commerce monopoly on their app store. Alito, what concerns me about your argument is that it doesn't seem to be based on the way in which this claim was understood by the lower courts. Maybe they misunderstood it. But, I mean, the opening line of the order granting Apple's motion to dismiss the Second Amended Complaint by the district court, the thrust of plaintiff's Second Amended Complaint is that Apple has engaged in antitrust conduct by collecting 30 percent of the price of iPhone applications. So the district court just missed it, Justice Alito, respectfully. And where – okay, where can you point to me where in the Ninth Circuit's opinion they understood your claim in the way that you've characterized it this morning? Yeah, they said on page 21A of the petition app, I think that's the page, that this is simply about a monopoly distribution, and that it is a simple case as a result of that. If you look at the bottom of 21A, the very last paragraph, And because of that, we have standing to complain that they are the seller of the apps. That's – it's a very simple case in that – it's viewed through that lens. Now, I accept, Justice Alito, that there have been a lot of arguments, and this idea about the 30 percent has led to a certain lack of clarity, but I think that the position we have written in our brief is the best articulation of what the underlying theory is here, and that is that the Apple monopoly app store overcharges iPhone owners for apps. And the role of the end in 99 cent requirement in that theory is what? In other words, would your theory be the same if no such requirement existed, or would it not? It would be still an overcharge case, Justice Kagan, because the theory economically is that if you are having to buy only from a monopoly, you are paying more than you would if there was a, you know, discount apps warehouse, or you could buy directly from the apps developer. Our assertion is that with multiple sellers, multiple suppliers of the apps, we would be able to buy them at a lower price. Is that competition? So what's the significance of that end in 99 cent rule? The significance of it is that it informs the price elevation and the price overcharge. And it also informs that contrary to Apple's assertion, they are not the agent of the apps developers. I mean, they put that in their contract. That's where you get to Justice Gorsuch's form over substance problem, because at 99 cents they are telling the app developer, we are foreclosing from you 99 percent of all pricing options. Robertson, Well, if it's that significant, why didn't you include it in the complaint? Frederick, Because it's not significant from this perspective, Mr. Chief Justice, and that is that with a monopoly store, the prices are overcharged. Our theory is relatively simple. They brought up the 99 cents in the blue brief. I think it's at page 9 of their brief where they raised the 99 cent issue. And as we were thinking about what the implications of that were, it became clear to us that that meant the app developer couldn't possibly be. Breyer, It sounds kind of late in the day to come up with a new litigation theory. Frederick, Well, no, we're at a pleading stage, Justice Gorsuch. Breyer, In the Supreme Court, the blue brief? Really? Frederick, Well, it's their – Breyer, I mean, should we be taking that up now? I mean, maybe you can amend your complaint or something like that on remand, but should we be addressing that? Frederick, Well, Justice Gorsuch, they were the ones, this is what I'm saying, that brought up the 99 cents. It wasn't us. Breyer, But we're usually court of review, not first view, right? Frederick, Well, no, our point was that when they raised the 99 cents is somehow proof that the developer actually gets to set the price. We say, no, it's actually irrelevant for the reasons which I've already stated. But secondly, it's just wrong, because if you're constraining what 99 percent of the pricing options are, that's what it is. But it also has the effect economically of raising the prices that the consumers have to pay. Breyer, It's going to add to your damages, correct? Potentially. Frederick, Well, it could potentially add to the damages or it could subtract from the damages. Breyer, Correct. Frederick, We don't know. What we know is what the price is in a noncompetitive market, and we will have to have experts that will assess what the damages would be in a competitive market. Breyer, Your theory doesn't depend on the 99 cents. Frederick, Our theory of damages or our theory of the violation? The theory of the violation is the wholly owned Monopoly app store as the place to sell apps. That is what the violation is here. And how you calculate the damages is you look at what is the overcharge based on what the Monopoly is selling the app for versus what it would be sold for in a competitive market. The antitrust scholars, and I would direct you to page 23 of their brief, they go through a lot of the pricing scenarios that you have explored through hypotheticals here, and they make very clear that as a matter of function what is happening here is that the Monopoly seller of the apps here is extracting an overcharge from the purchasers who are direct purchasers of those apps. Alito, If this case were to go to trial as a class action, would every app purchaser potentially be entitled to three times the 30 percent overcharge, or would it depend on the particular app? Frederick, Your Honor, I think that – I don't know the answer to your question fully. I'll be candid. I have not thought about how the experts are actually going to try to prove it up. What I would say, though, is that there probably, what will likely happen, is that because there are apps that are sold at 99 cents, a huge number of them are free, but a huge number are sold at 99 cents. Some other strata is sold for $1.99, some other strata is sold for $2.99 or $6.99. And I haven't put my head around, to be perfectly honest, exactly how you would carve up the damages on some sort of a pro-rata basis. But the idea, of course, of the Clayton Act is that treble damage is designed to deter antitrust violations. And so this Court has made very clear in its cases that the point of having that monopolist in this case act in a way that it is not penalized for its monopoly behavior. And if you were to suppose that it was just a single damages problem, it would be easy for monopolists to simply act, and if they get caught, they just simply pay over what they caused in damage. But the idea behind the Clayton Act's treble damages remedy is designed to deter actions just like this. And that is why Apple cannot point to another e-commerce distributor that does what it does. In every other instance, as we point out in the red brief, there is an alternative to buying the product. And in fact, Apple doesn't even do this with its own computer software, and we have pleaded that in the complaint, Mr. Chief Justice, where we say that if you buy software, you can buy it open source and you do not have to buy it through Apple's monopoly chain. So the iPhone app monopoly app store is a unique feature of the e-commerce setting. Apple has found ways, using technology and contractual constraints, to limit the opportunity of a competitive market to flourish. If a competitive market did flourish, the prices that iPhone owners pay would be lower. Thank you. Roberts. Thank you, counsel. Three minutes, Mr. Wall. Wall, thank you, Mr. Chief Justice. I think I need to begin with the experience I had in this case for its first nine years, and that is it was about a 30 percent commission. Paragraph 48 of the complaint is the key allegation, which is the root of the damages theory, which maintains that the 30 percent commission is a monopoly price. It's called a monopoly price. It's elsewhere called a super competitive price. It is the root of the damages theory, not just in part, not just on the periphery, but entirely. The brief in opposition at pages 5 and 12 make this unmistakably clear. At page 5, the brief in opposition states, quote, Respondents seek damages based solely on the 30 percent markup. So whatever other attributes of this case one may want to talk about that might contribute to the liability theory, the injury theory, the damages theory is, in their words, solely about the 30 percent. And it is the root of the damages theory. Ginsburg. Mr. Wall, I have a question about this Court's case law, and I'd like your answer to it. If Apple had, in every agreement with an iPhone owner, a provision that you can sue or can't sue, you have to go to an arbitral forum in a one-by-one, then Apple would be home free in this case. We do not have such a provision. In fact, all of the relevant agreements with both developers and consumers state that there shall be litigation in the Northern District of California. I know you don't, but suppose you did. If that were the case, then this would be a matter for arbitration. I don't think it changes the legal question. And it would take this case out of this Court, put it in an arbitral forum with a single complainant. Indeed, it would, but that's not this case. There is no concern about that in this case. The second point that I want to make relates to this duplicative recovery possibility. There is we never heard any suggestion prior to the Respondent's Merits Brief about potential lost profits claims based upon monopsony. To the contrary, the theory throughout the life of this case is that developers, if they sued, would sue over the same 30 percent markup. The brief in opposition at 12 says, any claim by the apps developers, excuse me, a claim by the apps developers, even if they had one, would not overlap the 30 percent markup paid by apps purchasers, rather it is a piece of the same 30 percent pie. So going back to what is Illinois BRIC about, it is about not having that apportionment fight. They admitted to the time that this case was on this Court's doorstep that this is all about an apportionment fight between the developers. As to the which is the better rule, the formalistic rule or the substantive rule, I suggest that the formalistic rule is always the one that is most subject to manipulation. The substantive rule that asks is your damages theory a pass-on theory focuses on what is of economic substance. And here, that's what the district court judge did. In a patient but persistent manner, she required them to say what is your theory. And at JA 137 to 143, you see the transcript of the district court argument when finally at JA 141, they said, or 143 rather, they said their theory is that because of the commission, the developer would mark up the app. That is a classic overcharge case. Now, to be sure, in a new setting, it's a new world setting, it's not the brick-and-mortar setting of the three cases that this case, that this Court has decided before, but it is the same economics that should have the same outcome prohibiting pass-through damages claims. Thank you, Counsel. The case is submitted.